# Exhibit B

# MIAMI-DADE COUNTY CLERK OF THE COURTS
## HARVEY RUVIN

Contact Us    My Account    

---

# CIVIL, FAMILY AND PROBATE COURTS ONLINE SYSTEM

◀◀ BACK

### RON GOLDSTEIN VS CHICK-FIL-A, INC.

| | | | |
|---|---|---|---|
| **Local Case Number:** | 2022-009265-CA-01 | **Filing Date:** | 05/19/2022 |
| **State Case Number:** | 132022CA009265000001 | **Judicial Section:** | CA07 |
| **Consolidated Case No.:** | N/A | **Case Type:** | Other Civil Complaint |
| **Case Status:** | OPEN | | |

## 👥 Parties
Total Of Parties: 2

| Party Description | Party Name | Attorney Information | Other Attorney(S) |
|---|---|---|---|
| Plaintiff | Goldstein, Ron | **B#:  (Bar Number)** 102630<br>N:  (Attorney Name) Angelica M Gentile, Esq | |
| Defendant | Chick-fil-A, Inc. | | |

## 🔨 Hearing Details
Total Of Hearings: 1

| Hearing Date | Hearing Time | Hearing Code | Description | Hearing Location |
|---|---|---|---|---|
| 06/28/2022 | 9:30AM | MOTCAL | Motion Calendar | |

## 🔖 Dockets
Total Of Dockets: 10

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| | | 06/28/2022 | | Motion Calendar | Hearing | **PLAINTIFF'S MOTION TO REMOVE FILED DOCUMENT, DOCKET ENTRY NO. 2** |
| 📄 | 9 | 06/01/2022 | | Notice of Hearing- | Event | **JUNE 28, 2022 AT 9:30 A.M.** |
| | | 05/31/2022 | | 20 Day Summons Issued | Service | |
| 📄 | 7 | 05/31/2022 | | ESummons 20 Day Issued | Event | **RE: INDEX # 5.**<br>Parties: Chick-fil-A Inc. |
| | 6 | 05/27/2022 | | Receipt: | Event | RECEIPT#:3080275 AMT PAID:$10.00 NAME:ANGELICA M GENTILE, ESQ 14 NE 1ST AVE STE# 705 MIAMI FL 33131 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3139-SUMMONS ISSUE FEE 1 $10.00 $10.00 TENDER TYPE:EFILINGS TENDER AMT:$10.00 RECEIPT DATE:05/27/2022 REGISTER#:308 CASHIER:EFILINGUSER |

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| | 6 | 05/26/2022 | | Motion... | Event | TO REMOVE FILED DOCUMENT: DOCKET NO. 2 |
| 📄 | 4 | 05/24/2022 | | Receipt: | Event | RECEIPT#:3100182 AMT PAID:$401.00 NAME:ANGELICA M GENTILE, ESQ 14 NE 1ST AVE STE# 705 MIAMI FL 33131 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3100-CIRCUIT FILING FEE 1 $401.00 $401.00 TENDER TYPE:EFILINGS TENDER AMT:$401.00 RECEIPT DATE:05/24/2022 REGISTER#:310 CASHIER:EFILINGUSER |
| 📄 | 5 | 05/23/2022 | | (M) 20 Day (C) Summons (Sub) Received | Event | |
| 📄 | 2 | 05/19/2022 | | Complaint | Event | |
| 📄 | 1 | 05/19/2022 | | Civil Cover Sheet - Claim Amount | Event | |

◀◀ BACK

**Please be advised:**

The Clerk's Office makes every effort to ensure the accuracy of the following information; however it makes no warranties or representations whatsoever regarding the completeness, accuracy, or timeliness of such information and data. Information on this website has been posted with the intent that it be readily available for personal and public non-commercial (educational) use and to provide the public with direct online access to information in the Miami-Dade Clerk's Office information systems. Other than making limited copies of this website's content, you may not reproduce, retransmit, redistribute, upload or post any part of this website, including the contents thereof, in any form or by any means, or store it in any information storage and retrieval system, without prior written permission from the Miami-Dade Clerk's Office.

If you are interested in obtaining permission to reproduce, retransmit or store any part of this website beyond that which you may use for personal use, as defined above, visit our Web API Services. You can review the complete Miami-Dade County Disclaimer.

## General

Online Case Home

Civil / Family Courts Information

Login

## Help and Support

Clerk's Home

Privacy Statement

ADA Notice

Disclaimer

Contact Us

About Us



## HARVEY RUVIN

Miami-Dade County
Clerk of the Courts



**FORM 1.997.    CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

     **I.**    **CASE STYLE**

IN THE CIRCUIT/COUNTY COURT OF THE <u>ELEVENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>MIAMI-DADE</u>   COUNTY, FLORIDA

<u>Ron Goldstein</u>
Plaintiff

Case # _____
Judge _____

vs.
<u>Chick-fil-A, Inc.</u>
Defendant

    **II.**    **AMOUNT OF CLAIM**

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐  $8,001 - $30,000
☐  $30,001- $50,000
☐  $50,001- $75,000
☐  $75,001 - $100,000
☒  over $100,000.00

    **III.**    **TYPE OF CASE**     (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
        ☐ Business governance
        ☐ Business torts
        ☐ Environmental/Toxic tort
        ☐ Third party indemnification
        ☐ Construction defect
        ☐ Mass tort
        ☐ Negligent security
        ☐ Nursing home negligence
        ☐ Premises liability—commercial
        ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
        ☐ Commercial foreclosure
        ☐ Homestead residential foreclosure
        ☐ Non-homestead residential foreclosure
        ☐ Other real property actions

☐ Professional malpractice
        ☐ Malpractice—business
        ☐ Malpractice—medical
        ☐ Malpractice—other professional
☒ Other
        ☐ Antitrust/Trade regulation
        ☐ Business transactions
        ☐ Constitutional challenge—statute or ordinance
        ☐ Constitutional challenge—proposed amendment
        ☐ Corporate trusts
        ☐ Discrimination—employment or other
        ☐ Insurance claims
        ☐ Intellectual property
        ☐ Libel/Slander
        ☐ Shareholder derivative action
        ☐ Securities litigation
        ☐ Trade secrets
        ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.  REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☒ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.  NUMBER OF CAUSES OF ACTION:** [  ]
(Specify)

  2

**VI.  IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☒ yes
    ☐ no

**VII.  HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.  IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

**IX.  DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
    ☐ yes
    ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Angelica Gentile Gentile      Fla. Bar # 102630
      Attorney or party             (Bar # if attorney)

Angelica Gentile Gentile         05/19/2022
  (type or print name)         Date

## IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.

| | |
|---|---|
| RON GOLDSTEIN, *on behalf of himself and all others similarly situated,* | |
| Plaintiff, | **CLASS ACTION** |
| v. | **JURY TRIAL DEMANDED** |
| CHICK-FIL-A, INC., | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff RON GOLDSTEIN, on behalf of himself and all others similarly situated, complains and alleges upon information and belief based, among other things, upon the investigation made by Plaintiff and through his attorneys as follows:

## NATURE OF ACTION

1.      This is a proposed class action seeking monetary damages, restitution, and injunctive and declaratory relief from Defendant Chick-fil-A, Inc. ("Defendant" or "Chick-fil-A"), arising from its deceptive and untruthful promises to provide FREE or flat fee, low-price delivery on food deliveries ordered through its app and website.

2.      Since the beginning of the Covid-19 pandemic, Chick-fil-A has moved aggressively into the food delivery business, exploiting an opportunity presented by Americans' reduced willingness to leave their homes. To appeal to consumers in a crowded food delivery marketplace during the national crisis, early in the pandemic Chick-fil-A began promising its customers "FREE DELIVERY" or low-price delivery in its mobile application and on its website, usually in the amount of $2.99 or $3.99.

3.      These representations, however, are false, because that is not the true cost of having

1

food delivered by Chick-fil-A. In fact, Chick-fil-A imposes hidden delivery charges on its customers in addition to the low "Delivery Fee" represented in its app and on its website.

4. On delivery orders only, Chick-fil-A secretly marks up food prices for delivery orders by a hefty 25-30%. In other words, the identical order of a 30-count chicken nuggets costs approximately $5-6 more when ordered for delivery than when ordered via the same mobile app for pickup, or when ordered in-store.

5. This hidden delivery upcharge makes Chick-fil-A's promise of FREE or low-cost delivery patently false. The true delivery costs are obscured, as described above, and far exceed its express representation that its "Delivery Fee" is FREE or a flat fee of only $2.99 or $3.99.

6. By falsely marketing a FREE or low-cost delivery charge, Chick-fil-A deceives consumers into making online food purchases they otherwise would not make.

7. Worse, Chick-fil-A was aware of consumer confusion regarding the secret menu upcharge. Upon information and belief, ███████████████████████████████ ████████ consumers were and would be deceived by hidden menu price markups of which they were not aware. Nonetheless, Chick-fil-A never informed its consumers of the menu price markup.

8. ██████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████.

9. Chick-fil-A intentionally deceived its customers regarding the true cost of its delivery service, hiding its delivery charges in menu price markups it never disclosed to its customers. Chick-fil-A did this because it was unhappy with the profitability and sales generated by truthful advertisements.

10. In fact, when Chick-fil-A first began offering delivery services in 2019, it offered a fair, truthful and transparent delivery fee of $4.99 *without* secretly marking up menu prices in any way on delivery orders. ████████████████████████████████████████ ██████████████████████ increase the profitability and sales generated by its delivery service by lying about its delivery charges to its customers.

11.     Specifically, early in the national Covid-19 crisis, Chick-fil-A saw an opportunity for exploitation.  It claimed to *reduce* its delivery fee to FREE, $2.99 or $3.99 in order lure customers into making delivery purchases from Chick-fil-A in a crowded food delivery marketplace. But unbeknownst to those customers, at the same time Chick-fil-A secretly raised its menu prices on delivery orders only in order to cover the costs of delivery and profit—without once disclosing the manipulation to customers.

12.     ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████.

13.     Chick-fil-A continues to misrepresent the nature of the delivery charges assessed on the Chick-fil-A mobile application and the website, by issuing in-app and online marketing materials that fail to correct reasonable understandings of its FREE or low-cost delivery promises, and that misrepresent the actual costs of the delivery service.

14.      Specifically, Chick-fil-A omits and conceals material facts about the Chick-fil-A delivery service, never once informing consumers in any disclosure, at any time, that the use of the delivery service causes a substantial increase in food prices.

15.     Hundreds of thousands of Chick-fil-A customers like Plaintiff have been assessed hidden delivery charges they did not bargain for.

16.     Consumers like Plaintiff reasonably understand Chick-fil-A's express "Delivery Fee" representation to disclose the total additional cost they will pay as a result of having their food delivered, as opposed to ordering online and picking up food in person, or ordering and picking up food in person.

17.     By unfairly obscuring its true delivery costs, Chick-fil-A deceives consumers and gains an unfair upper hand on competitors that fairly disclose their true delivery charges. For example, other restaurants such as Del Taco and El Pollo Loco both offer delivery services through their app and website.  But unlike Chick-fil-A's current practice, Del Taco and El Pollo Loco fairly

and prominently represent their true delivery charges—just as Chick-fil-A used to do.

18.    Plaintiff seeks damages and, among other remedies, injunctive relief that fairly allows consumers to decide whether they will pay Chick-fil-A's delivery mark-ups.

## PARTIES

19.    Plaintiff Ron Goldstein is a citizen of the State of Florida who resides in Sarasota, Florida.

20.    Defendant, Chick-fil-A Inc. is incorporated in Georgia and maintains its principal business offices in Atlanta, Georgia. Defendant maintains over 100 restaurant locations in the State of Florida.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction pursuant to Florida Rule of Civil Procedure 1.220 and Florida Statute § 26.012(2). The amount in controversy exceeds the jurisdictional minimum of this Court.

22.    Defendant is subject to personal jurisdiction in this state because it is registered with the Florida Department of State to conduct, and regularly conducts, business in this state.

23.    Venue for this action is proper in this Court pursuant to Fla. Stat. § 47.051 because (1) Defendant is a foreign corporation doing business in this state; and (2) the cause of action accrued in this county.

## COMMON FACTUAL ALLEGATIONS

**A.    Food Delivery Services Increase in Popularity, and then Explode in Popularity During the Pandemic.**

24.    In 2018, the online food delivery industry was an astounding $82 billion in gross revenue and projected to exceed $200 billion by 2025.[1]

25.    US Foods reports that the average American consumer has two food delivery apps

---

[1] *See* Frost & Sullivan, *$9.6 Billion in Investments Spurring Aggressive Expansion of Food Delivery Companies,* October 25, 2019, accessible at https://ww2.frost.com/news/press-releases/9-6-billion-in-investments-spurring-aggressive-expansion-of-food-delivery-companies/, last accessed January 19, 2021.

installed on their mobile phone and uses those apps three times per month.[2]

26.     The online food delivery industry predominately influences the country's most financially vulnerable populations. A nationwide research study conducted by Zion & Zion reveals that the largest user markets for online delivery food services are the young and the poor.[3] During a 90-day timeframe, 63% of consumers between the ages of 18 and 29 used a multi-restaurant delivery website or app service, followed by 51% of consumers between the ages of 30 to 44.[4] The study also demonstrated that the "less income a consumer earns, the more likely the consumer is to take advantage of restaurant delivery services," as those earning less than $10,000 per year ordered online delivery the most (51.6%).[5]

27.     Put plainly, the allure for online food delivery services has historically been based upon pure convenience. A 2019 Gallup study of third-party delivery services companies like GrubHub, DoorDash, and Uber Eats reported 72% of customers order online food delivery because they don't want to leave their house; 50% so that they can continue with their ongoing activities; and 41% to avoid bad weather.[6]

28.     According to data compiled by Yelp, food delivery orders have *doubled* since the Covid-19 outbreak began.[7]

29.     The arrival of the unprecedented Covid-19 pandemic escalated the value of online

---

[2] *See* US Foods, *New Study Shows What Consumers Crave in a Food Delivery Service,* 2019, accessible at https://www.usfoods.com/our-services/business-trends/2019-food-delivery-statistics.html, last accessed January 19, 2021.

[3] *See* Aric Zion and Thomas Hollman, Zion & Zion Research Study, *Usage and Demographics of Food Delivery Apps,* accessible at https://www.zionandzion.com/research/food-delivery-apps-usage-and-demographics-winners-losers-and-laggards/, last accessed January 19, 2021.

[4] *Id.*

[5] *Id.*

[6] *See* Sean Kashanchi, Gallup, *Third-Party Delivery Will Grow; Is Your Restaurant Ready?,* May 6, 2019, accessible at https://www.gallup.com/workplace/248069/third-party-delivery-grow-restaurant-ready.aspx, last accessed January 19, 2021.

[7] *See* Tal Axelrod, The Hill, *Yelp: Delivery and take-out twice as popular as usual amid coronavirus,* March 20, 2020, available at https://thehill.com/policy/technology/488749-yelp-delivery-and-take-out-twice-as-popular-as-usual-amid-coronavirus, last accessed January 19, 2021.

food delivery services from one of pure convenience to that of a comforting necessity for many consumers who are sick, in a high-risk population group for Covid-19, or simply do not feel safe to leave their homes and venture out into the public to purchase food during quarantine.

30.     In its 2019 Economic Report conducted by research firm Technomic, DoorDash reported that 86% of customers agreed that DoorDash played an important role in helping them access food during the pandemic and 77% of consumers increased their use of third-party delivery services during this time.[8] Indeed, amidst the uncertainty of the novel virus, 68% of consumers now view ordering food online for delivery as the safer option.[9]

31.     The era of Covid-19 undoubtedly caused a significant revenue boom for third party delivery services. SEC filings indicate that the top four U.S. food-delivery apps (DoorDash, Uber Eats, GrubHub, and Postmates) collectively experienced a *$3 billion increase* in revenue in just two quarters, April through September, following the enactment of shelter-in-place restrictions throughout the nation.[10]

32.     The ramp up in utilization of food delivery services also had a massive positive impact on restaurant owners who were quickly on the brink of facing permanent closures during lockdown: 67% of restaurant operators said DoorDash was crucial to their business during Covid-19 and 65% say they were actually able to *increase* profits during this time because of DoorDash.

33.     In the wake of the food delivery surge, Consumer Reports highlighted the need for

---

[8] *See* Technomic and DoorDash, 2019 Economic Impact Report, *The Impact of DoorDash on Economic Activity and Restaurant Resilience,* available at https://doordashimpact.com/media/2019-Economic-Impact-Report.pdf, last accessed January 19, 2021.

[9] *Id.*

[10] *See* Levi Sumagaysay, Market Watch, *The pandemic has more than doubled food-delivery apps' business. Now what?,* last updated November 27, 2020, available at https://www.marketwatch.com/story/the-pandemic-has-more-than-doubled-americans-use-of-food-delivery-apps-but-that-doesnt-mean-the-companies-are-making-money-11606340169, last accessed January 19, 2021.

fee transparency for consumers who use these apps and services.[11] A research team investigated food delivery companies and the report measured their compliance with new rules regarding fees enacted in seven US cities aimed at protecting consumers and businesses during the pandemic. It found that these companies continued to not comply with the new ordinances and continued to "employ design practices that obfuscate fees." They concluded that "[c]onsumers deserve to have informed choices to understand what they are being charged for *and* how their dollars spent impacts the restaurants they support and patronize in their communities."

**B.    Chick-fil-A's App and Website Fails to Bind Users to Any Terms of Service.**

34.    When a consumer downloads the Chick-fil-A app, or uses the Chick-fil-A website, he may create an account in order to place an order for delivery or pickup.

35.    In order to do so, a user enters in a name and contact information.

36.    While the account creation screen contains a small hyperlink to view Chick-fil-A's Terms of Service and Privacy Notice, users are not required to affirmatively consent to such terms, such as by clicking or checking a box.

**C.    Prior to the Pandemic, Chick-fil-A Offered a $4.99 Delivery Fee with No Menu Price Markup, Then Discovered It Could Increase Sales by Shifting Delivery Costs to Hidden Menu Upcharges.**

37.    Chick-fil-A first began offering delivery services in 2019. At that time, it offered a truthful and transparent delivery fee of $4.99 *without* secretly marking up menu prices in any way on delivery orders.

38.    Specifically, it promised "Delivery Fee: $4.99" during the checkout process and did not mark up menu prices on delivery orders. This was a clear promise that the total, marginal cost of having food delivered versus picking it up in store was represented by the $4.99 Delivery Fee.

---

[11] *See* Consumer Reports, *Collecting Receipts: Food Delivery Apps & Fee Transparency,* September 29, 2020, accessible at https://digital-lab-wp.consumerreports.org/wp-content/uploads/2020/09/Food-delivery_-Report.pdf, last accessed January 19, 2021.

39.     However, Chick-fil-A was not content with the profitability and sales generated by its delivery service.

40.     ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████.

41.     Chick-fil-A was aware of consumer confusion regarding the secret menu upcharge.
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████.

42.     ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████.

43.     So that is precisely what Defendant did during the early days of the Covid-19 pandemic: it *lowered* its Delivery Fee, sometimes to FREE, and *raised* its menu prices by 25%-30% on delivery orders only.

44.     ██████████████████████████████████████████████████████████, Chick-fil-A made an intentional decision to absorb delivery charges into hidden menu upcharges.

45.     Instead of fairly and transparently disclosing this change to its customers—who were already under tremendous stress from the pandemic—Chick-fil-A chose to operate in the shadows. It continued to make a clear promise that the total, marginal cost of having food delivered versus picking it up in store was represented by a new FREE or $2.99 or $3.99 Delivery Fee.

46.     But because it secretly inflated menu prices on delivery orders only, and never informed customers of this policy, it misrepresented the true cost of delivery.

47.     Chick-fil-A intentionally deceived its customers regarding the true cost of its delivery service, hiding its delivery charges in menu price markups it never disclosed to its customers.

48.     Upon information and belief, ████████████████████████████████████████

██████████████████████ involved in the secret, delivery-only menu price markups made at the same time the company was promising delivery was FREE or low cost. ███████ ██████████████████████████.

**D.      Chick-fil-A Prominently and Plainly Represents a Flat "Delivery Fee" on its App and Website.**

49.      Beginning in the early days of the Covid-19 pandemic, Chick-fil-A began prominently featuring FREE and low-cost delivery promises on its mobile application and on its website.

50.      Such representations often are made on the home screen of the app or website, and were always made on the check-out screen of the app and website, prior to the finalization of an order.  On that screen, Chick-fil-A promised a flat "Delivery Fee" that was FREE, $2.99 or $3.99. As an example, for supposed "FREE DELIVERY" orders, the order finalization screen states:

Subtotal: [representing the cost of the food selected]

Tax: [representing sales tax]

Delivery Fee: FREE

Tip:

Total:  [adding up the above]

51.      As an example, for supposed "$3.99 Delivery Fee" orders, the order finalization screen states:

Subtotal: [representing the cost of the food selected]

Tax: [representing sales tax]

Delivery Fee: $3.99

Tip:

Total:  [adding up the above]

52.     In short, the Delivery Fee promises further the reasonable perception that such fee is what covers delivery costs.

**E.     Chick-fil-A Omits and Conceals Material Facts About the Costs of the Chick-fil-A Delivery Service.**

53.     But those disclosures were false and misleading, and the delivery charge was not, in fact, FREE or a flat fee of $2.99 or $3.99.

54.     Chick-fil-A furtively marked up the cost of food reflected in the "Subtotal"— adding a hefty 25-30% to the cost of the food items ordered for delivery. Chick-fil-A did not and does not make similar markups for identical food items ordered via the same app or website, where such items are ordered for pickup instead of delivery.

55.     Chick-fil-A omitted this material fact from its app and website disclosures, never informing users of this secret markup.

56.     Worse, Chick-fil-A designed its app to make it *impossible* for consumers to catch its hidden menu price inflation.  The company ensured that food prices were only displayed on the app or website *after* a customer chose delivery or pickup, ensuring delivery customers could not see the price inflation.

57.     This secret markup—which Chick-fil-A *only* applies to delivery orders—is a hidden delivery fee. This renders false Chick-fil-A's promise of a FREE or a flat, low-cost delivery fee of $2.99 or $3.99, which is made repeatedly in the app and the website, and then again in the "Delivery Fee" line item on the order screen.

58.     This secret markup was specifically designed to cover the costs of delivering food and profit on that delivery. It was, in short, exclusively a charge for using Chick-fil-A's delivery service.

59.     In short, the "Delivery Fee" is not actually $2.99 or $3.99. The actual "Delivery Fee"—the extra charge for having food delivered as opposed to picking it up—is the listed "Delivery Fee" *plus* the hidden food markup applied exclusively to delivery orders.

60.     Chick-fil-A does not inform consumers the true costs of its delivery service and it

misrepresents its "Delivery Fee" as $2.99 or $3.99, when in fact that cost is actually much higher.

**F.      Other Restaurant Industry Actors Disclose Delivery Fees Fairly and Transparently—And Chick-fil-A Did So Before it Changed its Practice.**

61.     By unfairly obscuring its true delivery costs, Chick-fil-A deceives consumers and gains an unfair upper hand on competitors that fairly disclose their true delivery charges. For example, other restaurants like Del Taco and El Pollo Loco both offer delivery services through their app and website.  But unlike Chick-fil-A, Del Taco and El Pollo Loco fairly and prominently represent their true delivery charges.

62.     For example, Del Taco does not mark-up food charges for delivery orders through its app. Instead, for delivery orders its ordering screen presents the following:

>  Subtotal:

>  Tax:

>  Delivery Charge:

>  Tip:

63.     All line-item amounts are **_identical_** for delivery and pick-up orders, except for the plainly and fairly disclosed delivery charge—allowing consumers to understand the true cost of the delivery service.

64.     Similarly, El Pollo Loco does not mark-up food charges for delivery orders through its app. Instead, for delivery orders its ordering screen presents the following:

>  Subtotal:

>  Delivery Charge:

>  Tax:

65.     All line-item amounts are **_identical_** for delivery and pick-up orders, except for the plainly and fairly disclosed delivery charge—allowing consumers to understand the true cost of the delivery service.

66.     As described above, this is exactly what Chick-fil-A itself did prior to the Covid-19 pandemic.

67.     Lastly, although Instacart, the grocery delivery service, does mark-up item charges for delivery orders made through its app, it provides an express warning to consumers that the item prices listed on its app are "higher than in-store prices." Instacart's clear disclaimer is made visible to consumers before they place their orders and allows consumers to understand that they are paying a higher price for utilizing the delivery service, as opposed to what they would pay had they purchased the same items in-store.

## G.     Plaintiff's Experience

68.     From within Florida, Plaintiff Ron Goldstein made an online purchase of food from the Chick-fil-A restaurant located in Miami Lakes, Florida on September 1, 2021, in the total amount of $25.30.

69.     Prior to placing his order, the Chick-fil-A app stated that the Delivery Fee was $2.99.

70.     However, the cost of food ordered by Plaintiff bore a hidden delivery fee markup. To illustrate, Chick-fil-A charged Plaintiff $9.49 for a Chick-fil-A Sandwich Meal.

71.     Upon information and belief, the same item would have cost Plaintiff 25-30% less than what he had paid had he picked it up from the Chick-fil-A location instead.

72.     Plaintiff would not have made the purchase had he known the Chick-fil-A delivery fee was not in fact $2.99.

73.     If he had known the true delivery fee, he would have chosen another method for receiving food from Chick-fil-A or ordered food from another provider.

## CLASS ALLEGATIONS

74.     Pursuant to Florida Rule of Civil Procedure 1.220(b)(2) and (b)(3), Plaintiff brings this action on behalf of himself and a class of similarly situated persons defined as follows:

> All persons in Florida who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, ordered food delivery through the Chick-fil-A mobile app or website, and were assessed higher delivery charges than represented.

75.     Excluded from the Class is Defendant, any entities in which they have a controlling interest, any of their parents, subsidiaries, affiliates, officers, directors, employees and members of such persons' immediate families, and the presiding judge(s) in this case, and their staff. Plaintiff reserves the right to expand, limit, modify, or amend this class definition, including the addition of one or more subclasses, in connection with his motion for class certification, or at any other time, based upon *inter alia,* changing circumstances and/or new facts obtained during discovery.

76.     **Numerosity**:  At this time, Plaintiff does not know the exact size of the Class; however, due to the nature of the trade and commerce involved, Plaintiff believes that the Class members are well into the thousands, and thus are so numerous that joinder of all members is impractical.  The number and identities of Class members is administratively feasible and can be determined through appropriate discovery in the possession of the Defendant.

77.     **Commonality**:  There are questions of law or fact common to the Class, which include, but are not limited to the following:

    a.     Whether during the class period, Defendant deceptively represented Delivery Fees on food deliveries ordered through the Chick-fil-A website and mobile app;

    b.     Whether Defendant's alleged misconduct misled or had the tendency to mislead consumers;

    c.     Whether Defendant engaged in unfair, unlawful, and/or fraudulent business practices under the laws asserted;

    d.     Whether Defendant's alleged conduct constitutes violations of the laws asserted;

    e.     Whether Plaintiff and members of the Class were harmed by Defendant's misrepresentations;

    f.     Whether Plaintiff and the Class have been damaged, and if so, the proper measure of damages; and

g.      Whether an injunction is necessary to prevent Defendant from continuing to deceptively represent low-price, flat delivery fees on food deliveries ordered through the Chick-fil-A website and mobile app.

78.     **Typicality**:  Like Plaintiff, many other consumers ordered food for delivery from Chick-fil-A's website or mobile app, believing delivery to be the flat fee represented based on Defendant's representations. Plaintiff's claims are typical of the claims of the Class because Plaintiff and each Class member was injured by Defendant's false representations about the true nature of the delivery fee. Plaintiff and the Class have suffered the same or similar injury as a result of Defendant's false, deceptive and misleading representations. Plaintiff's claims and the claims of members of the Class emanate from the same legal theory, Plaintiff's claims are typical of the claims of the Class, and, therefore, class treatment is appropriate.

79.     **Adequacy of Representation**:  Plaintiff is committed to pursuing this action and has retained counsel competent and experienced in prosecuting and resolving consumer class actions.  Plaintiff will fairly and adequately represent the interests of the Class and does not have any interests adverse to those of the Class.

80.     **The Proposed Class Satisfies the Prerequisites for Injunctive Relief**. Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive and equitable relief with respect to the Class as a whole. Plaintiff remains interested in ordering food for delivery through Chick-fil-A's website and mobile app; there is no way for him to know when or if Defendant will cease deceptively misrepresenting the cost of delivery.

81.     Specifically, Defendant should be ordered to cease from representing their delivery service as a low-price, flat delivery fee and to disclose the true nature of their delivery fee.

82.     Defendant's ongoing and systematic practices make declaratory relief with respect to the Class appropriate.

83.     **The Proposed Class Satisfies the Prerequisites for Damages**. The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication

of the controversy.  The likelihood that individual members of the Class will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation, especially when compared to the relatively modest amount of monetary, injunctive, and equitable relief at issue for each individual Class member.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract**

91.     Plaintiff repeats and re-alleges the above allegations as if fully set forth herein.

92.     Plaintiff and Chick-fil-A have contracted for food delivery services, as embodied in the representations made in the Chick-fil-A app and website.

93.     No contract provision authorizes Chick-fil-A be able to impose hidden delivery charges on its customers in addition to the "delivery charge" represented in its app and on its website.

94.     Chick-fil-A breached the terms of its contract with consumers by charging an additional 25-30% more for food items ordered for "delivery" than the contracted-for "delivery charge."

95.     Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the contract.

96.     Plaintiff and members of the Class have sustained damages as a result of Defendant's breach of the contract and breach of the implied covenant of good faith and fair dealing.

**SECOND CLAIM FOR RELIEF**
**Unjust Enrichment**

97.     Plaintiff repeats and re-alleges the above allegations as if fully set forth herein.

98.     This Count is brought solely in the alternative. Plaintiff acknowledges that the breach of contract claim cannot be tried along with unjust enrichment.

99.     To the detriment of Plaintiff and the Class, Defendant has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein.

100.     Defendant unfairly, deceptively, unjustly, and/or unlawfully seized and accepted said benefits which, under the circumstances, would be unjust to allow Defendant to retain.

101.     Plaintiff and the Class, therefore, seek disgorgement of all wrongfully obtained fees received by Defendant as a result of its inequitable conduct as more fully stated herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff on behalf of himself and the Class seeks judgment in an amount to be determined at trial, as follows:

(a)      For an order enjoining Defendant from continuing the unlawful practices set forth above;

(b)      For declaratory and injunctive relief as set forth above;

(c)      For an order requiring Defendant to disgorge and make restitution of all monies it acquired by means of the unlawful practices set forth above;

(d)      For compensatory damages according to proof;

(e)      For punitive damages according to proof;

(f)      For reasonable attorneys' fees and costs of suit;

(g)      For pre-judgment interest; and

(h)      Awarding such other and further relief as this Court deems just, proper and equitable.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all claims so triable.

Dated: May 19, 2022                                  Respectfully Submitted,

**SHAMIS & GENTILE, P.A.**

By:      */s/ Andrew J. Shamis*
         Andrew J. Shamis, Esq.
         Florida Bar No. 101754
         ashamis@shamisgentile.com
         Edwin E. Elliott, Esq.
         Florida Bar No. 1024900
         edwine@shamisgentile.com

16

14 NE 1st Avenue, Suite 705
Miami, Florida 33132
(t) (305) 479-2299

**KALIELGOLD PLLC**

Jeffrey D. Kaliel
jkaliel@kalielpllc.com
Sophia Goren Gold
sgold@kalielgold.com
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Tel: (202) 350-4783

**EDELSBERG LAW, P.A.**

Scott Edelsberg, Esq.
Florida Bar No. 0100537
Christopher Gold, Esq.
Florida Bar No. 088733
scott@edelsberglaw.com
chris@edelsberglaw.com
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Office: (786) 289-9471
Direct: (305) 975-3320
Fax: (786) 623-0915

*Counsel for Plaintiff and Proposed
Class*

## IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA

### CASE NO. 2022-009265-CA-01

RON GOLDSTEIN, individually and on behalf of all                   CLASS ACTION
others similarly situated,

    *Plaintiff*,                                                                JURY TRIAL DEMANDED

vs.

CHICK-FIL-A, INC.

    *Defendant*.

_____/

### SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff/Certified Process Server of the State:

    **YOU ARE COMMANDED** to serve this summons and a copy of the Complaint, in this action on Defendant:

        Chick-Fil-A, Inc.
        c/o Susan Tammy Pearson- Registered Agent
        5200 Buffington Road Atlanta
        GA 30349, Atlanta, GA, 30349, USA

    Each Defendant is required to serve written defenses to the Complaint or petition on**: Andrew Shamis, Esq, Shamis & Gentile, P.A., 14 NE 1st Ave STE 705, Miami, Florida 33132**, within **twenty (20) days** after service of this summons on that Defendant, exclusive of the date of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the complaint or petition.

Dated this _____ day of _____,

                     As Clerk of the Court

                     By: _____
                         As Deputy Clerk

## IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 2022-009265-CA-01

RON GOLDSTEIN, *on behalf of himself and all others similarly situated,*

                Plaintiff,

v.

CHICK-FIL-A, INC.,

                Defendant.

**CLASS ACTION**

**JURY TRIAL DEMANDED**

### PLAINTIFF'S MOTION TO REMOVE FILED DOCUMENT: DOCKET NO. 2

Plaintiff, Ron Goldstein, respectfully requests that an order be granted to remove Docket No. 2, Plaintiff's Class Action Complaint, from the docket. In support thereof, Plaintiff states:

1. On May 19, 2022, Plaintiff electronically filed the Complaint.

2. On May 24, 2022, after Plaintiff filed the Complaint, Defendant's counsel notified Plaintiff that it believed certain information contained therein is confidential.

3. Without taking a position on Defendant's confidentialty deterimination, in the interest of caution, Plaintiff hereby requests that the Complaint, Docket No. 2, be removed completely from the docket or removed from public access. Once that occurs, Plaintiff will re-file a Complaint that omits the information Defendant believes is confidential.

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's Motion to Remove Filed Document: Docket No. 2.

1

Dated:  May 26, 2022

**SHAMIS & GENTILE, P.A.**

*/s/ Andrew J. Shamis*
Andrew J. Shamis, Esq.
Florida Bar No. 101754
ashamis@shamisgentile.com
14 NE 1st Ave, Suite 705
Miami, FL 33132

**KALIELGOLD PLLC**

Jeffrey D. Kaliel
*jkaliel@kalielpllc.com*
Sophia Goren Gold
*sgold@kalielgold.com*
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Tel: (202) 350-4783

*Counsel for Plaintiff and the Proposed
Class*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was sent via E-Mail

on May 24, 2022, to all counsel of record.

                              **SHAMIS & GENTILE, P.A.**
                              14 NE 1st Ave., Suite 705
                              Miami, FL 33132
                              Telephone (305) 479-2299

                              */s/ Andrew J. Shamis*
                              Andrew J. Shamis, Esq.
                              Florida Bar No. 101754

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT**
**IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

**CASE NO. 2022-009265-CA-01**

RON GOLDSTEIN, individually and on behalf of all           CLASS ACTION
others similarly situated,

    *Plaintiff*,                                   **JURY TRIAL DEMANDED**

vs.

CHICK-FIL-A, INC.

    *Defendant*.

_____/

## SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff/Certified Process Server of the State:

    **YOU ARE COMMANDED** to serve this summons and a copy of the Complaint, in this action on Defendant:

                   Chick-Fil-A, Inc.
                   c/o Susan Tammy Pearson- Registered Agent
                   5200 Buffington Road Atlanta
                   GA 30349, Atlanta, GA, 30349, USA

    Each Defendant is required to serve written defenses to the Complaint or petition on**: Andrew Shamis, Esq, Shamis & Gentile, P.A., 14 NE 1st Ave STE 705, Miami, Florida 33132**, within **twenty (20) days** after service of this summons on that Defendant, exclusive of the date of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the complaint or petition.

                   5/31/2022

Dated this _____ day of _____,

             Harvey Ruvin,
             Clerk of Courts            As Clerk of the Court

                                     217043

                         By: _____
                             As Deputy Clerk

## IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA

RON GOLDSTEIN, individually and on behalf of all        CLASS ACTION
others similarly situated,

Plaintiff,                              CASE NO. 2022-009265-CA-01

vs.

CHICK-FIL-A, INC.                     JURY TRIAL DEMANDED

 Defendant.

_____/

### NOTICE OF HEARING

    **YOU ARE HEREBY NOTIFIED** that we will call up for hearing before the Honorable Maria De Jesus Santovenia**,** Circuit Court Judge for the Eleventh Judicial Circuit In and for Miami-Dade, Florida, to be taken virtually via Zoom , on **June 28, 2022 at 9:30 A.M.** or as soon thereafter as same can be heard, the following:

### PLAINTIFF'S MOTION TO REMOVE FILED DOCUMENT: DOCKET NO. 2

Zoom Meeting ID: 97363560582
Zoom Dial In Number: +1 786-635-1003
Zoom Link: https://zoom.us/j/97363560582

**Please Be Governed Accordingly**

### CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed via the Court's Electronic Filing System and served to all those listed on the e-service list on June 01, 2022 .

                          /s/ Andrew J. Shamis
                          **SHAMIS & GENTILE, P.A.**
                          Florida Bar No. 101754
                          14 NE 1st Ave., Suite 705
                          Miami, FL 33132
                          Telephone (305) 479-2299
                          Facsimile (786) 623-0915
                          Email: efilings@shamisgentile.com